"C" FISH COMPANY LIMITED ET AL. *v.* JAMES F. SHUGRUE, COMMISSIONER OF TRANSPORTATION, ET AL. (3977)

DUPONT, C. J., BORDEN and SPALLONE, Js.

Argued March 14—decision released June 3, 1986

*Herbert Watstein,* for the appellants (plaintiffs).

*Jon S. Berk,* with whom, on the brief, was *Timothy L. Hammack,* for the appellee (named defendant).

*Andrew J. O'Keefe,* with whom were *Peter K. O'Keefe* and, on the brief, *Denise Martino Phelan,* for the appellee (defendant O & G Industries, Inc.).

BORDEN, J. The plaintiffs, the "C" Fish Company Limited (Fish), Attilio Ciurcovich, and Cecil R. Wescome, appeal from the trial court's judgment fol-

lowing directed verdicts in favor of the defendants, the commissioner of transportation and O & G Industries (O & G), a road paving contractor under contract with the state to repave sections of Interstate 84. The principal issue in this appeal is whether the plaintiffs produced sufficient evidence to permit a finding that the commissioner had actual or constructive knowledge of a highway defect, namely, the presence of a piece of metal allegedly lying in the traveled portion of the highway, or that O & G caused that piece of metal to be in or to remain in the highway. We hold that the evidence was insufficient, and find no error.

On October 27, 1976, at approximately 2 a.m., while traveling west on Interstate 84 in Middlebury, the plaintiffs' tractor trailer truck hit a piece of metal in the left lane of the highway, crashed and burned. The owner and driver of the tractor, Wescome, suffered injuries in addition to the damage to the tractor. Ciurcovich, the president of Fish, who was a passenger in the truck, suffered injuries, and Fish suffered the loss of its trailer and cargo. The plaintiffs sued the commissioner pursuant to General Statutes § 13a-144. They also sued O & G on the grounds of nuisance, pursuant to General Statutes (Rev. to 1975) § 19-310, now § 19a-335,[1] and negligence. Following a jury trial on the issue of liability, the trial court directed verdicts in favor of both defendants. The plaintiffs timely moved to set aside the verdicts and their motion was denied without a written memorandum of decision. This appeal followed.

---

[1] General Statutes § 19a-335 provides: "If any person places anything, or permits anything to remain, in a highway, or digs up the ground therein, by which the passage of travelers is obstructed or endangered or the highway encumbered, the same shall be a common nuisance, and such person shall be fined not more than fifty dollars; and the court, before which the conviction is had, shall order the defendant to remove such nuisance within thirty days, and, on his failure to do so, it shall be removed at his expense by a constable of the town, and such court may tax such expense and issue an execution therefor."

With regard to the plaintiffs' suit against the commissioner, the trial court concluded that the plaintiffs failed to produce sufficient evidence to support a finding that the commissioner had either actual or constructive knowledge of the particular defect which caused the collision. See *Lukas* v. *New Haven,* 184 Conn. 205, 207, 439 A.2d 949 (1981). There was no evidence of actual knowledge. Thus, the trial court's conclusion may be viewed as a finding that the plaintiffs failed to show that the defect, namely, the piece of metal in the highway, existed "for such a length of time that it would have been [constructively] known in the exercise of reasonable care." *Baker* v. *Ives,* 162 Conn. 295, 305, 294 A.2d 290 (1972); *Wadlund* v. *Hartford,* 139 Conn. 169, 176, 91 A.2d 10 (1952). With regard to the suit against O & G, the trial court concluded that the plaintiffs failed to produce sufficient evidence to support a finding that O & G caused the defect to be in or remain in the highway; General Statutes § 19a-335; in breach of a duty owed to the plaintiffs. The issue presented in this appeal is whether the trial court correctly concluded that the evidence was insufficient to remove those issues from the realm of speculation and conjecture. See *Patrick* v. *Burns,* 5 Conn. App. 663, 667–68, 502 A.2d 432 (1985).

It is useful to note at the outset that, while the suits against the two defendants were based on separate legal grounds, there is an overlap of significant factual issues between the two cases. The threshold factual issue with regard to O & G was whether O & G caused the piece of metal to be in or remain in the traveled portion of the highway. Similarly, proof of when the defect originally came into existence was also central to the case against the commissioner because that evidence must logically support the inference that the defect remained in the highway for a sufficient period of time; *Baker* v. *Ives,* supra; for the jury to conclude

that the commissioner had constructive notice of its existence. Id. In addition, the period of time that the defect remained in the highway was relevant to the issue of whether O & G was liable for negligence and nuisance. See General Statutes § 19a-335, supra. Thus, because of this overlap of these critical features of the two cases, we discuss the issues in this appeal with regard to both defendants together. In reviewing the record to determine whether the plaintiffs introduced sufficient evidence of the origin or initial cause of the defect, we view the evidence in the light most favorable to the plaintiffs. *Roy* v. *Michaud,* 5 Conn. App. 695, 698, 501 A.2d 1231 (1985). That evidence is as follows.

Connecticut state police trooper Gary Knapik testified that, at approximately 2:15 a.m. on October 27, 1976, he responded to the scene of the collision on Interstate 84 in Middlebury. He testified that Interstate 84 extends for approximately three miles[2] between the Middlebury-Waterbury town line on the east and the Middlebury-Southbury town line on the west. The accident occurred approximately two-tenths of a mile west of the Waterbury town line, according to Knapik's measurement. In that area, the westbound lanes were comprised of two lanes, twelve feet wide, with a three-foot wide shoulder on each side and a grassy median divider on the left or south side between the westbound and eastbound lanes. Knapik further stated that upon interviewing Wescome he searched the area and found a piece of metal on the median, which was to the south of the point where he found tire tracks indicating where the truck left the road. Wescome told him that the truck tire hit the piece of metal in the road. The truck traveled approximately 240 feet beyond the point of impact,

---

[2] A state transportation department employee subsequently testified that the highway extends a distance of approximately six miles through Middlebury.

struck a rock ledge and came to rest on its side, according to Knapik. The site of the point of impact was west of a bridge abutment.

Knapik described the piece of metal as approximately fifteen to eighteen inches long, shaped in the form of an L and resembling a piece of guardrail. The road condition was dry and Knapik found no evidence that the truck was traveling at an excessive speed. Nor had there been any other accidents that evening, according to Knapik. He inspected the guard railing west of the bridge abutment on both sides of the highway and found no damage to any of the guardrails. He did not, however, note his observations with respect to the guardrails in his written report. Knapik also testified that Wescome appeared to be in normal condition after the accident.

Wescome testified that he was driving westbound in the left hand lane approximately fifty-five miles per hour, and as he proceeded past the bridge abutment he saw a gray piece of metal about ten feet ahead in the road. The piece of metal was shaped roughly like an L. Wescome further testified that his front left wheel hit the top edge of the metal, the tire burst and the entire wheel came off of the truck. The cab of the truck hit the rock ledge in the median and the truck tipped over and began to burn. Wescome, a professional driver, had inspected the truck before beginning the trip.

When he looked around after the accident, Wescome saw road paving equipment, which he referred to as a roller and an asphalt spreader, parked on the grassy median nearby. Wescome testified that Knapik searched the area and presented him with a piece of metal with black marks on it and one corner bent over with a small piece of rubber tire bent into the metal. He recognized the tread design as similar to his tire.

He testified that the metal piece had a hole in the center and sharp edges on both sides and a rounded surface up and down its length. The piece of metal resembled a piece of "B-beam" guardrail.

There were two types of guardrailing in use in the general vicinity of the accident. On the west side of the bridge abutment was cable and post railing and on the east side was B-beam railing. Wescome testified that he inspected the guardrailing on both sides of the bridge and found no damage. He also confirmed, on cross-examination, that B-beam railing is used on the sides of certain trailers.

In 1976, O & G was awarded a contract for the repaving of that section of Interstate 84 which extends through Middlebury. During early October, 1976, the state performed preparatory work on the highway in advance of the repaving by O & G, which included the use of a mechanical sweeper and other large machinery including a skid box, which is a hopper on the front of a truck with a skid and a skreet attached to it. This machinery leveled and filled cracks and wheel ruts. This work did not require the removal of guardrails and state transportation department records showed that no work of any kind had been performed on any guardrails in the Middlebury area from October 1 through October 29, 1976. The state personnel and trucks were utilized in the area of the repaving work for purposes of loading and unloading traffic warning signs. At the end of the work day, the state personnel would leave certain equipment in the area of the work site.

O & G's contract for repaving work required, inter alia, the spreading of bituminous asphalt. It did not call for O & G to remove or to touch any of the guardrails on Interstate 84. O & G began repaving on October 12, 1976. It used an asphalt spreader with a skreet, which was comprised of one solid piece of metal ten feet wide

with hydraulic extenders to add an additional three feet on each side. The extenders were suspended approximately one foot off the pavement. The function of the skreet was to apply and compact the bituminous asphalt into the road surface. The paving included both the traveled portion of the highway and the shoulders. O & G did not work on the bridges.

The paver with extenders was in use until October 25, 1976, when it broke down. On the afternoon of October 25, O & G completed its work with a rental paver which was not equipped with the hydraulic extender arms. On October 26, O & G did not work on this repavement project because of rain. As of the date of the accident, in the early morning hours of October 27, O & G had completed its repaving work in an area that was two and two-tenths miles from the Middlebury-Waterbury town line, or two miles west of the accident site. The area was inspected on a daily basis by state workers and opened for travel.

On the basis of this evidence, the plaintiffs posit essentially two theories as to the origin or cause of the piece of metal in the road, neither of which is sufficiently grounded in the evidence. On the one hand, the plaintiffs contend that the piece of guardrail was knocked into the road by O & G during its repaving work. Contrary to the plaintiffs' argument, however, there is no basis upon which the jury could infer that the extender arm knocked the piece of metal into the road on October 25, because O & G was forced to complete its repaving work with the rental paver, which was not equipped with extender arms. In addition, because O & G's contract did not require any work on guardrails, and there was no damage to the guardrails in the vicinity of the accident, the plaintiffs' first theory is highly speculative at best.

Furthermore, even if we were to assume that one or the other of the pavers in use by O & G knocked the piece of guardrail into the highway, it was still necessary that the jury be able logically to infer that the piece of metal remained in the road from the afternoon of October 25, when O & G finished its work, through October 26, when there was no work due to rain. The jury would also have to infer that the piece of metal was moved from the work site to the point where it was hit by the plaintiffs' truck tire. In addition, because there was no B-beam railing west of the bridge abutment, the jury would necessarily have to infer that the piece of metal was moved from the east side of the bridge, where there was B-beam railing, to the west side, where the accident occurred. The evidence, however, does not support these inferences without recourse to speculation and conjecture, which is impermissible. See *Roy* v. *Michaud,* supra.

The plaintiffs' alternative theory is that the state caused the piece of metal to enter and remain in the road. A review of the evidence, however, renders this theory even more speculative than the first. The evidence clearly indicated that the state did no work on guardrailing during the month of October. Although the state did perform preparatory work involving machinery similar to that used by O & G, there was no evidence that the state touched the guardrails while performing this work.[3] In addition, it would have been necessary for the jury to infer that the piece of metal remained in the road unnoticed by anyone for approximately three weeks from the date of the state's preparatory work to the date of the accident. Since the evidence failed to indicate that this piece of metal was

---

[3] We note further that there was evidence that *if* the state were to require B-beam guardrailing, this repair work *might* involve the cutting of sections from the main railing under repair. As pointed out, however, there was no evidence that any such work was performed during the entire month of October. Thus, this theory is based on pure speculation.

previously seen by anyone except Wescome, or that it had caused other accidents on October 26 or at any other time, the inference that the state caused this defect to enter or remain in the highway is likewise based wholly on speculation and conjecture. Id.

At most, the only evidence linking O & G to the cause of this defect was the contract to repave the entire length of Interstate 84 through Middlebury. The only evidence linking the state to the cause of the defect was that it did similar work before O & G began repaving. There was no other basis upon which the jury could rationally infer the source or origin of the defect. In addition, absent any proof of the point in time when the defect came into existence, there was insufficient evidence upon which to infer that it remained in existence for any given period of time. Without these essential evidentiary links, the jury could not reasonably infer that the commissioner had constructive notice of the defect, or that O & G was liable for negligence or nuisance.[4] Thus, the trial court did not err in directing verdicts in favor of both defendants.

There is no error.

In this opinion the other judges concurred.

---

[4] The plaintiffs also claim that the trial court erred by excluding from evidence a photograph of the highway, which was offered to show the structure of the bridge abutment and the guardrails. The trial court excluded this photograph on the ground that the plaintiffs had not established a proper foundation. Although our review of the record indicates that the plaintiffs had established a proper foundation for this photograph, the record also indicates that other photographs, which were introduced into evidence, depict the bridge and guardrails. Therefore, we sustain the trial court's ruling on the alternate ground that the evidence was cumulative. See *Allied Plywood, Inc.* v. *Planning & Zoning Commission,* 2 Conn. App. 506, 509, 480 A.2d 584 (1984).